## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

      -vs-

JULIUS WHITE,

                Defendant.

REPORT AND RECOMMENDATION

24-CR-06012-EAW-MJP

## APPEARANCES

For the United States:                Everardo A. Rodriguez
                                        U.S. Attorney's Office - Rochester
                                        100 State Street
                                        Rochester, NY 14614

For the Defendant:                   Robert W. Wood, Esq.
                                          2080 Ridge Road West
                                        Rochester, NY 14626

## INTRODUCTION

**Pedersen, M.J.** Defendant Julius White ("Defendant") is charged by way of an indictment returned on January 23, 2024, with being a felon in possession of ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). (Indictment, ECF No. 23.) The charge relates to ammunition, namely five (5) 9mm Luger (9x19mm) caliber cartridges and one (1) 9mm Luger (9x19mm) caliber cartridge case. The indictment also contains a forfeiture allegation relating to the following:

    a. One (1) black Diamondback DB9 9mm caliber handgun with no serial number;

    b. Five (5) 9mm Luger (9x19mm) caliber cartridges; and

    c. One (1) 9mm Luger (9x19mm) cartridge case.

(*Id.*)

Defendant filed his omnibus motion on March 11, 2024 (ECF No. 35), and the government filed its opposition on March 29, 2024 (ECF No. 37). The undersigned held oral argument on the omnibus motion on April 10, 2024, and entered an order addressing all of the issues raised in Defendant's motion, except for reserving on Defendant's motion to dismiss the indictment on the grounds that 18 U.S.C. § 922(g)(1) is unconstitutional as applied to him under the reasoning of the Supreme Court in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), and on that aspect of the motion seeking to suppress statements and tangible evidence. (Order, ECF No. 39.)

The undersigned then held an evidentiary hearing on April 30, 2024, regarding Defendant's motion to suppress tangible evidence. The government presented one witnesses: Rochester Police Officer Kyle Spry. In addition, the undersigned received four exhibits from the government into evidence, which included: (1) a Certificate of Business Records that establishes the authenticity of the 911 call; (2) a DVD containing the body worn camera footage of the incident from Officer Kyle Spry and Officer Jack Gagliano, as well as a recording of the 911 call; (3) a transcript of the 911 call; and (4) the job card containing the information relayed by 911 dispatch. The defense submitted Officer's Spry's two-page report regarding the incident. The parties thereafter submitted post-hearing briefing on the issue of Defendant's motion to suppress evidence seized at the time of his arrest. (Def.'s Post-Hearing Mem., July 2, 2024, ECF No. 45; Gov'ts Post-Hearing Mem., July 17, 2024, ECF No. 46.)

After considering oral argument, the hearing and exhibits, and reviewing the motion papers the undersigned reports and recommends that the District Judge **DENY** Defendant's motion for dismissal of the Indictment, **DENY** Defendant's motion to suppress statements, and **DENY** Defendant's motion to suppress tangible evidence. (ECF No. 35.)

## STANDARD OF LAW

On January 1, 2024, the Honorable Elizabeth A. Wolford referred this matter to the undersigned to address all pre-trial matters, including all pre-trial matters that a Magistrate Judge may hear and determine pursuant to 28 U.S.C. § 636(b)(1)(A), and those which a Magistrate Judge may hear and thereafter file a report and recommendation for disposition pursuant to Section 636(b)(1)(B). She also ordered all procedural aspects of matters properly before the Magistrate Judge under the Order, including scheduling and the filing of briefs or other supporting material, shall be determined by the Magistrate Judge and all motions or applications shall be filed with the Clerk and made returnable before the Magistrate Judge. (Text Order of Referral, ECF No. 25.)

## DISCUSSION

### Defendant's Motion to Dismiss the Indictment
### Legal History: The Supreme Court decides Heller, McDonald, and Bruen.

"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend II. This right gives the people "an individual right to keep and bear arms." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008).

But *Heller* only invalidated a District of Columbia law that "ban[ned] handgun possession in the home." 554 U.S. at 573–75, 635. The Supreme Court did not address the right to "bear arms" outside of the home until *New York State Rifle & Pistl Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).

After *Heller*, the Supreme Court incorporated this Second Amendment right onto the states through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010). There, the Court invalidated several municipal statutes that banned handguns in homes. *Id*. at 749–50.

Finally, in *Bruen*, the Supreme Court recognized the right to bear arms outside of the home: "consistent with *Heller* and *McDonald*, [ ] the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." 597 U.S. at 10. The Second Amendment now applies to permit "the people" to keep and bear arms inside and outside of the home.

### *Heller, McDonald, and Bruen* all state that the Second Amendment right to keep and bear arms is not unlimited.

The Supreme Court has unambiguously stated that Second Amendment rights are "not unlimited." *Heller*, 554 U.S. at 595; *McDonald*, 561 U.S. at 786 (quoting *Heller*, 554 U.S. at 626) ("It is important to keep in mind that *Heller*, while striking down a law that prohibited the possession of handguns in the home, recognized that the right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'"). The Court has taken pains to reiterate that "nothing" in its opinions "should be taken to cast doubt

on" well-established "presumptively lawful regulatory measures." *Heller*, 554 U.S. at 626–27. Such presumptively lawful regulatory measures include "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.*, 554 U.S. at 626–27; *McDonald*, 561 U.S. at 786 ("repeat[ing]" the *Heller* "assurances"). As discussed below, the Supreme Court has embraced the sensitive place limitation and criminal background checks. It follows that the Court is likely to permit regulatory measures about felons and firearms.

### *Bruen calls for a new test.*

After *Heller* and *McDonald*, lower courts developed tests to determine the constitutionality of laws implicating the Second Amendment. Courts in this circuit would first "determine whether the challenged legislation impinges upon conduct protected by the Second Amendment," and second, would determine "the appropriate level of scrutiny to apply and evaluate the constitutionality of the law using that level of scrutiny." *United States v. Jimenez*, 895 F.3d 228, 232 (2d Cir. 2018). The Supreme Court rejected the second step of this analysis in *Bruen*.

Despite courts' expertise in applying means-ends scrutiny, *Bruen* rejected it because it was a step of the framework courts developed post-*Heller* and *McDonald*. "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Bruen*, 597 U.S. at 19. In keeping with *Heller*, the Court in *Bruen* "essentially remove[d] the second step—the means ends balancing—from the

inquiry," making the focus on "textual and historical analysis alone." *United States v. Hampton*, 676 F. Supp. 3d 283, 298, n.15, (S.D.N.Y. 2023) (quoting *Bruen*, 597 U.S. at 19) ("Despite the popularity of this two-step approach, it is one step too many.")).

The *Bruen* Court then replaced the test courts had developed based on *Heller* and *McDonald*:

> The standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

*Bruen*, 597 U.S. at 24. The Court then indicated that historical tradition can be established by analogical reasoning, which "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 30 (emphasis in original). Critically, "modern regulations that were unimaginable at the founding" need only be "relevantly similar" to an historical analogue. *Id.* at 28–29.

### Findings of fact regarding Defendant's motion to dismiss the Indictment.

Defendant seeks dismissal of the indictment on the basis that the statute that he is charged with violating, 18 U.S.C. § 922(g)(1), is unconstitutional as applied to him, relying on *Bruen*. (*Id.*) Defendant was previously convicted of Assault in the 2nd Degree (a felony) and argues that:

> Although the crime of Assault existed in the 18th century, it was not considered a felony, and, upon information and belief, no tradition existed at that time to exclude any individuals convicted of assault from possessing a weapon. "The traditional common law felonies were nine: murder, manslaughter, arson, burglary, robbery, rape, sodomy,

mayhem, and larceny." Will Tress, *United Collateral Consequences: Defining Felony in the Early American Republic*, 57 Clev. St. L. Rev. 461, 464 (2009). (citation omitted).

(Wood Aff. ¶ 17.)

In opposition, the government contends that *Bogle*—finding section 922(g)(1) as constitutional—is still good law and that *Bruen* "did not abrogate" *Bogle's* holding that "§ 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons." (Gov'ts Mem. of Law at 5–6, ECF No. 37 quoting *Bogle*, 717 F.3d at 281–82.) In addition, the government contends Defendant's argument that § 922(g)(1) is unconstitutional, because assault was not considered a felony in the 18th century and there is no tradition that those convicted of assault were prohibited from possessing a weapon, fails for several reasons. (*Id*. at 6.)

First, the government contends that "nothing in *Heller, McDonald, or Bruen* suggests the need for a felony-by-felony analysis of Section 922(g)(1)'s constitutionality. To the contrary, *Heller* and *McDonald* explain that 'permissible . . . exceptions' to the Second Amendment include 'longstanding prohibitions on the possession of firearms by felons,' with no explicit limitation on the nature of the felons' crimes." (*Id*. at 7.) Second, the government asserts that "recognizing that Congress may disarm individuals who have been convicted of crimes that satisfy the common definition of a felony (that is, crimes punishable by imprisonment for more than one year) is consistent with how the Supreme Court has interpreted other Bill of Rights provisions that require distinctions among different types of crimes." (*Id*.) Third, the government contends that "a regime of individualized as-applied

challenges to Section 922(g)(1) would distort the separation of powers [because it] would in effect usurp the Executive Branch's role of deciding when to make 'exceptions' to the 'rigor' and 'severity' of the 'criminal code' enacted by Congress." (*Id.* at 8.) Fourth, "the type of as-applied challenge [Defendant] seeks would treat the right to possess arms differently from other rights that criminals forfeit upon conviction." (*Id.*) Fifth and finally, the government argues that "individualized as-applied challenges to Section 922(g)(1) would pose serious problems of judicial administration, creating a body of law that, in its reliance on historical analysis, would be more complicated to apply and more prone to creating inconsistent results than even the categorical approach." (*Id.* at 9.)

### *Legal conclusions regarding Defendant's motion to dismiss the Indictment: Defendant's challenges fail under controlling Second Circuit precedent.*

The undersigned is bound by *United States v. Bogle*, 717 F.3d 281 (2d Cir. 2013). There, the Second Circuit upheld the constitutionality of Section 922(g)(1) considering *Heller* and *McDonald*. The Court "turned what" might be "characterize[d] as 'dicta' in *Heller* and *McDonald* into binding precedent." *Hampton*, 2023 WL 3934546, at *12. The Second Circuit held, based exclusively on the felon-in-possession language in *Heller* and *McDonald*, that Section 922(g)(1) is constitutional. *See Bogle*, 717 F.3d at 281–82 ("Section 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons."). The Second Circuit reasoned that in *Heller* and *McDonald* "the Supreme Court clearly emphasized that recent developments in Second Amendment jurisprudence should not 'be taken to cast doubt on longstanding

prohibitions on the possession of firearms by felons.'" *Id*. at 281 (quoting *Heller*, 554 U.S. at 626).

*Bogle* thus does not rest on the means-end analysis that the Supreme Court rejected in *Bruen*. Because it rests instead on the language in *Heller* and *McDonald*, the undersigned finds that it is binding. *See Hampton*, 2023 WL 3934546, at *12 ("With *Heller* and *McDonald* still in full force after *Bruen*, *Bogle* remains binding precedent within this Circuit on the constitutionality of [S]ection 922(g)."); *United States v. Baker*, No. 23-CR-6087CJS, 2023 WL 5511343, at *3 (W.D.N.Y. July 12, 2023), *report and recommendation adopted*, No. 23-CR-6087 CJS/MWP, 2023 WL 5510401 (W.D.N.Y. Aug. 25, 2023). This is the position of trial courts in the Second Circuit. *See United States v. Delima*, No. 2:22-CR-00111, 2023 WL 6443925, at *2 n.4 (D. Vt. Oct. 3, 2023) (collecting cases). Accordingly, the undersigned reports and recommends that the District Judge deny Defendant's motion to dismiss the Indictment.

### *In any event, the Supreme Court appears poised to uphold the "reasonable restrictions" language in Heller and McDonald.*

Were that not enough, a majority of Supreme Court justices seem poised to uphold cases like *Bogle*. *See Vincent v. Garland*, 80 F.4th 1197, 1201 (10th Cir. 2023) (noting that "six of the nine Justices pointed out that *Bruen* was not casting any doubt on" *Heller*'s language about convicted felons). Justice Kavanaugh, joined by Chief Justice Roberts, concurred in *Bruen*. He approvingly quoted *Heller*'s language that felon-possession prohibitions are "presumptively lawful" under *Heller* and *McDonald*. 597 U.S. at 80–81 (quoting *Heller*, 554 U.S. at 626–27) ("Properly interpreted, the

Second Amendment allows a 'variety' of gun regulations."). Accordingly, the Supreme Court seems to have intimated—for now—that Section 922(g)(1) is constitutional.

And as the Tenth Circuit noted in *Vincent*, the *Bruen* Court "apparently approved the constitutionality of regulations requiring criminal background checks before applicants could get gun permits." *Vincent*, 80 F.4th at 1201. The Tenth Circuit stated: "In preserving 'shall-issue' regimes and related background checks, the Court arguably implied that it was constitutional to deny firearm licenses to individuals with felony convictions. *Bruen*'s language thus could support an inference that the Second Amendment doesn't entitle felons to possess firearms." *Id*. at 1202; *but see Atkinson v. Garland*, 70 F.4th 1018, 1022–23 (7th Cir. 2023) ("Since oral argument, the government has also urged us to conclude, without any historical analysis, that the plain text of the Second Amendment does not cover felons . . . *Bruen* left this complicated issue unresolved."). For this independent reason, the undersigned also rejects Defendant's argument and reports and recommends that the District Judge deny Defendant's motion.

### *Defendant's as-applied challenge fails.*

With respect to Defendant's challenge on an as-applied basis the undersigned rejects this argument because Defendant does not dispute his prior felony convictions. *See Baker*, 2023 WL 5511343 at *3 (rejecting as-applied challenge where it was "clear that" the defendant's "conviction was 'punishable by imprisonment for a term exceeding one year,'" and thus fell in the ambit of Section 922(g)(1)). Nor could he.

Indeed, Defendant does not dispute that that he has previously been convicted of two felonies. On March 10, 2011, Defendant was convicted after a plea of guilty in Monroe County Court to Assault in the second degree, Intent to Cause Physical Injury with a Weapon/Instrument, a class D felony. (Compl. at ¶ 7; Gov'ts Mem. of Law at 6.) Defendant was sentenced on or about March 10, 2011, to two years in prison. (*Id.*) Additionally, in May 2018, Defendant was convicted after pleading guilty in Monroe County Court to Attempted Assault in the second degree, Intent to Cause Physical Injury with a Weapon/Instrument, a class E felony. (*Id.*) Defendant was sentenced on or about June 14, 2018, to eighteen months to three years in prison. (*Id.*)

Since Defendant has not disputed these felony convictions any argument that Section 922(g)(1) is unconstitutional as applied to him fails on the basis that *Bogle* is controlling precedent, providing that Section 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons. For all of the above reasons the undersigned reports and recommends that the District Judge deny Defendant's motion to dismiss the Indictment.

### *Findings of Fact Regarding Defendant's Motion to Suppress Statements.*

Defendant contends that the government provided notice pursuant to 12(b)(4) of its intention to use alleged oral statements and/or admissions that Defendant made at or near the time of his arrest. (Wood Aff. ¶¶ 5–6, ECF No. 35-1.) Defendant further contends that when the police tackled and searched him he was no longer free to leave and was thus in custody. (*Id.* ¶ 7.) Defendant asserts that the undersigned should recommend suppression of any statements or admissions he may have made because

he was not given his *Miranda* warnings or that the Court should hold a hearing to resolve any disputed issues of fact. (*Id.* ¶¶ 7–8.)

The government indicates that it intends to use the statements and utterances Defendant made at the time of his arrest "while he resisted and struggled with officers" when they were trying to take him into custody and when the police were walking Defendant over to the police car after being handcuffed and taken into custody. (Gov'ts Mem. of Law at 1, ECF No. 37; Trans. of Evidentiary Hearing 5:11–20, Apr. 30, 2024, ECF No. 42.) The government contends that Defendant voluntarily and spontaneously made these statements and utterances and that they were not in response to any police questioning. (Gov'ts Mem. of Law at 1, ECF No. 37; Trans. of Evidentiary Hearing 5:22–25.)

### Legal Conclusions Regarding Defendant's Motion to Suppress Statements.

An evidentiary hearing is required where a defendant demonstrates a "sufficiently definite, specific, detailed, and nonconjectural" issue of fact. *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992); *United States v. Richardson*, No. 09-CR-55A(Sr), 2010 WL 5553995, *1 (W.D.N.Y. Dec. 9, 2010) ("In order to warrant a suppression hearing, the defendant must demonstrate a specific factual dispute that can be resolved by a hearing"; collecting cases), *report and recommendation adopted* 2011 WL 53476 (W.D.N.Y. Jan. 7, 2011). An attorney's affidavit made without personal knowledge is insufficient to create an issue of fact requiring an evidentiary hearing. *United States v. Gillette*, 383 F.2d 843, 848 (2d Cir. 1967); *United States v. Ahmad*, 992 F. Supp. 682, 685 (S.D.N.Y. 1998). In the absence of a demonstrated

issue of fact, "there is no basis for holding an evidentiary hearing or suppressing the evidence." *Ahmad*, 992 F. Supp. at 685; *see also Richardson*, 2010 WL 5553995 at *1 (recommending that the district court deny motion to suppress statements where no issue of fact existed).

Here, Defendant has failed to submit any evidence from someone with personal knowledge of any purported post-arrest statements Defendant may have made. Defendant has only submitted an affidavit from his attorney who does not have personal knowledge of the circumstances of any alleged statements made by Defendant. Thus, Defendant has not demonstrated the existence of an issue of fact warranting an evidentiary hearing. Nor do his papers demonstrate that suppression is warranted as a matter of law. Accordingly, the undersigned reports and recommends that the District Judge deny that part of Defendant's motion seeking to suppress statements (ECF No. 35).

### Findings of Fact Regarding Defendant's Motion to Suppress Tangible Evidence.

Defendant asserts that the undersigned should recommend suppression of "any and all evidence derived from an alleged unlawful search and seizure of his person following his arrest on July 29, 2023" because its discovery was the result of a warrantless arrest. (Def.'s Post-Hearing Mem. of Law at 1, ECF No. 45.) Defendant contends that "the circumstances of this seizure were based upon vague [a] secondhand description without probable cause or reasonable suspicion." (Wood Aff. ¶ 12.) He indicates that a person from an unknown address called the police to report that her children told her that there was "a man on the front porch [of 363 Magnolia

Street] with a gun. He was described as having the name 'Julius White' and was wearing a blue shirt." (*Id.* ¶ 9.) Defendant asserts that the police did not talk to anyone upon arriving at 363 Magnolia Street but that they saw a person wearing a blue shirt standing at the end of the driveway of 367 Magnolia Street. (*Id.* ¶¶ 9–10.) Defendant contends that 4 police officers "marched single file" toward him and when the lead officer moved to grab Defendant he backed away and started running, and the officers "aggressively" chased him. (*Id.* ¶ 10–11.) The police seized a gun from Defendant's pocket and arrested him. (*Id.* ¶ 11.) Defendant asserts that the officers did not try to engage in conversation with him or ask for identification prior to his arrest. (*Id.* ¶ 12.)

The government contends that police legally seized the firearm and ammunition from Defendant at the time of his arrest. (Gov't Mem. of Law at 1, ECF No. 37.) The government asserts that the officers had reasonable suspicion to stop Defendant as a result of the information provided during the 911 call. During the evidentiary hearing the government proffered that the 911 caller's daughter called her and indicated that "Julius White"—the daughter referred to him by name—was outside the house displaying a handgun. (Trans. of Evidentiary Hearing 4:9–13, Apr. 30. 2024, ECF No. 42.) The caller described Defendant as "36 years old, black male wearing a blue shirt." (*Id.* at 4:13–14.) Further, the government contends that the officers "were authorized to give chase to pursue their investigation" when Defendant ran away from them. (Gov't Mem. of Law at 1; Gov't Post-Hearing Mem of Law at 8, ECF No. 46.)

During the evidentiary hearing Rochester Police Officer Kyle Spry testified that that he received a radio call and a report over his dispatch through the Emergency Communications Department ("job card"). (Trans. of Evidentiary Hearing at 6:16–19; 8:2–16; 17:20:25.) The government offered the job card into evidence as government's exhibit 4. Officer Spry testified that the job card he received on July 29, 2023, at 3:40 p.m. indicates that the incident was a "caller versus friend, displayed a gun," that the individual's name was "Julius White, 36-year-old black male, last seen wearing a blue shirt, alcohol involved," and that the "[m]ale was on the porch of this location (363 Magnolia Street)." (*Id.* at 18:18–19:6; 20:14–21:1; 21:12–13.) Officer Spry further confirmed that the caller was "waiting by 269 Magnolia [Street]. Her children are inside the house." (*Id.* at 21:8–11.) He testified that he was in uniform and was in his own marked patrol vehicle and that the two other officers who responded to the incident, Jack Gagliano and Eric Herr, arrived in patrol cars in uniform. (*Id.* at 22:3–18; 29:6–8.) He testified that he approached Defendant and saw him holding a beer. (*Id.* at 37:24–38:18.) The officers gave chase once Defendant started running "[b]ecause he matched the description, the EC - - the Emergency Communications Department and our job card that relayed to us . . . [that there] was a black male wearing a blue shirt approximately 36 years old and alcohol involved . . . and he had a gun." (*Id.* at 26:9–23.) Officer Spry further testified that they chased Defendant because "if [Defendant] did have a gun, was intoxicated and running through people's backyards, it's a risk to the community." (*Id.* at 20:24–21:2.)

During cross-examination at the hearing Officer Spry testified that he did not know what Defendant looked like prior to arriving at the scene. (*Id*. at 39:14–24.) Officer Spry also testified that he did not speak to anyone at 363 Magnolia Street about whether the individual he was approaching was Defendant. (*Id*. at 39:10–14.) Officer Spry further testified that his intention when he saw Defendant "was to at least detain [him] and figure out if he was involved." (*Id*. at 46:6–12.) The job card shows that the officers arrested Defendant less than two minutes after Officer Spry arrived on the scene. (*Id*. at 34:16–18.)

On redirect, Officer Spry testified that he was about to walk into the walkway of 363 Magnolia Street but did not go to the door because he "saw the individual that matched the description given on the job card." (*Id*. at 48:15–49:3.) When Officer Spry told Defendant to show him his hands Defendant did not comply but instead began walking away and then ran. (*Id*. at 43:2–10.) He testified that he asked to see Defendant's hands because "the call was for a man with a gun and he matched the description. So [he] wanted to make sure that he was not going to—harm [the officers] or any other citizens." (*Id*. at 50:14–51.)

In addition, the government offered into evidence a portion Officer Spry's body worn camera footage and Officer Gagliano's body worn camera footage for the incident in question, an audio recording of the 911 call,  as well as a transcript of that call.[1]

---

[1] The government indicated that the transcript of the 911 call contained three blank lines where it removed the name, address, and phone number of the caller because the hearing was a public proceeding. (Trans. of Evidentiary Hearing 10:18–22.)

A review of Officer Spry's body worn camera footage shows him approaching a driveway where a black male in a blue shirt can be seen. (Officer Spry's body worn camera footage at 0:00:37.) Officer Spry says "How 'ya doin? Show me your hands. K. Show me your hands" and in response Defendant turns begins to walk away and then starts running towards the back of the driveway and attempts to climb over a fence. (Officer Spry's body worn camera footage at 0:00:30–0:00:44; Officer Gagliano's body worn camera footage at 0:00:34–00:01:00.) Officer Spry testified that Defendant was "grabbing a hold of the fence" and was not complying with the officers' demands, as heard in the video, to let go of the fence, to stop resisting, and to show them his hands. (Trans. of Evidentiary Hearing at 24:8–20; Officer Gagliano's body worn camera footage at 0:00:40–00:00:50.) Soon after you can hear an officer say "He's reaching." (Officer Gagliano's body worn camera footage at 0:00:55.) Officer Spry testified that they patted Defendant down when he was taken into custody to "check for weapons" and that he found a gun in Defendant's right front pants pocket. (Trans. of Evidentiary Hearing at 25:9–14; 27:3–8.) Officer Spry also testified that Defendant "kept kicking his leg up in an attempt to try to get [the officers] to not reach into that pocket." (*Id*. at 25:9–14.) In addition, in listening to Officer Spry's body worn camera footage an officer searching Defendant's pockets after his arrest found a shell casing. (Officer Spry's body worn camera footage at 00:06:46.)

***Legal Conclusions Regarding Defendant's Motion to Suppress Tangible Evidence.***

In *Terry v. Ohio*, the Supreme Court held

> where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

392 U.S. 1 (1968). In reviewing the reasonableness of a *Terry* stop, courts ask whether there was a "'particularized and objective basis'" for suspicion of legal wrongdoing under the "'totality of the circumstances.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411–12, 417–18 (1981)). A *Terry* stop must be "justified at its inception." *Terry*, 392 U.S. at 20. A seizure occurs when (1) a person obeys a police officer's order to stop or (2) a person that does not submit to an officer's show of authority is physically restrained. *United States v. Swindle*, 407 F.3d 562, 572 (2d Cir. 2005).

Here, the undersigned believes that the description of Defendant as provided by the 911 call, the short period of time that elapsed between when Officer Spry arrived at the scene after receiving the radio call/job card (*i.e.,* approximately 4 to 5 minutes later), Defendant's geographic proximity to the location he was said to have been during the call (on the porch of 363 Magnolia Street) versus where Officer Spry located him (in the driveway between 363 and 367 Magnolia Street), that the body

camera footage did not depict any other individuals aside from Defendant in the area, that Defendant was holding a beer can (when the job card indicated "alcohol involved"), and Officer Spry's order for Defendant to show him his hands with which Defendant did not comply, provided ample reasonable suspicion for the officers to approach Defendant to determine if he was the individual who had a gun. In other words, the officers' actions were reasonable because the totality of the circumstances supports that Defendant was engaging in wrongdoing.

Once Defendant ignored Officer Spry's order to show his hands, then turned, fled, and ignored the officers' orders to stop running the officers had probable cause to arrest Defendant. *United States v. Baldwin*, 496 F.3d 215, 220 (2d Cir. 2007) (holding probable cause existed after a suspect did not comply with orders to show his hands, in conjunction with other conduct, and thereafter fled from police); *United States v. Martinez–Gonzalez*, 686 F.2d 93, 100 (2d Cir. 1982) ("[P]robable cause to arrest [Defendant] . . . arose once [Defendant] turned [from approaching officers] and fled."); *United States v. Vanhoesen*, 552 F. Supp. 2d 335, 343 (N.D.N.Y. 2008) ("The police were justified in their attempt to stop Defendant on Second Street, . . . and thus to pursue him when he fled."); *Morgan v. Superintendent*, 88 F. Supp. 2d 312, 317–18 (E.D.N.Y. 2000) (Plaintiff's flight combined with failing to stop after uniformed police ordered him to do so contributed to totality of the circumstances, which in turn satisfied the probable cause required for his subsequent arrest); *Wieder v. City of New York*, 2013 WL 1810751, at *8 (E.D.N.Y. Apr. 29, 2013), *cert. denied*, 567 U.S. 1022 (2015) (Plaintiff's flight, which was observed by the uniformed officers, when

combined with other evidence, contributed to establishing probable cause for his arrest).

After the officers handcuffed Defendant and took him into custody, they lawfully conducted a search of Defendant's person incident to arrest and for officer safety reasons, which is when they found the gun. As explained in *United States v. Diaz*, 854 F.3d 197 (2d Cir. 2017), *cert. denied*, 583 U.S. 1123 (2018):

> The search-incident-to-arrest doctrine is an exception to the general requirement that an officer must obtain a judicial warrant supported by probable cause before conducting a search. See *Riley v. California*, —— U.S. ——, 134 S.Ct. 2473, 2482, 189 L.Ed.2d 430 (2014) (recognizing a search incident to an arrest as a "specific exception" to the Fourth Amendment's warrant requirement). It serves two interests: "protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy." *Arizona v. Gant*, 556 U.S. 332, 339, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009). These interests are not evaluated on a case-by-case basis, but are assumed to be present whenever an officer is justified in making an arrest. *Riley*, 134 S.Ct. at 2483. It makes no difference whether the search occurs before or after the arrest, *see Rawlings v. Kentucky*, 448 U.S. 98, 111, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), so long as it is "substantially contemporaneous with the arrest and is confined to the immediate vicinity of the arrest," *Shipley v. California*, 395 U.S. 818, 819, 89 S.Ct. 2053, 23 L.Ed.2d 732 (1969) (internal quotation marks omitted).

*Id.* at 205.

For the reasons discussed above the undersigned reports and recommends that the District Judge deny that part of Defendant's motion seeking to suppress tangible evidence.

## CONCLUSION

Based on the foregoing, the undersigned reports and recommends that the District Judge **DENY** Defendant's motion for dismissal of the Indictment, **DENY**

Defendant's motion to suppress statements, and **DENY** Defendant's motion to suppress tangible evidence. (ECF No. 35.)

Pursuant to 28 U.S.C. § 636(b)(1), the Court hereby

**ORDERS**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

DATED: August 9, 2024
      Rochester, New York

MARK W. PEDERSEN
United States Magistrate Judge